Isaac D. Zorea
Law Office of Isaac Derek Zorea
P.O. Box 210434
Anchorage, AK 99521
(907) 677-3779
(907) 644-2802 facsimile

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

DOUG BECKER,                          )
               Plaintiff,        )
                      )
           v.              )       Case No. 3:09-cv-00015-TMB
                      )
KIKIKTAGRUK INUPIAT                  )
CORPORATION, an Alaskan Village      )
Corporation,                          )
               Defendant.        )
_____ )

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

      Plaintiff Doug Becker opposes the motion for summary judgment filed by the Defendant Kikiktagruk Inupiat Corporation (hereinafter: "KIC").  Summary judgment is designed to deny a party's day in court.  It should not be granted lightly.  It is appropriate where (1) the material facts are undisputed; and (2) the moving party is entitled to judgment as a matter of law.  The material facts in this case are greatly in dispute as to many material issues.  Additionally, KIC's legal arguments are severely flawed and misconstrued.  Based on the flawed arguments within its motion, this court should deny KIC's motion for summary judgment on all issues presented.

      The standard for granting summary judgment requires much greater evidence than what the defendant has provided.  At the summary judgment stage, the moving party bears the burden of proving that no triable issue remains for a jury to decide, and that the law compels judgment in its favor.  KIC cannot satisfy its burden, and this court should dismiss its attempt to thwart Becker's right to his day in court.

## I.     FACTUAL BACKGROUND

On about August 2, 2006, President for Kikiktagruk Inupiat Corporation (KIC), Bish Gallahorn hired Doug Becker to work as the general manager for KIC Hardware, Auto, and Lumber (KIC HAL), for a one year contract of $80,000.00 annually, plus paid housing. Affidavit of Doug Becker, at 1. [Hereinafter: "Aff.Plt., at __."]  Mr. Becker accepted the job offered by Bill Gallahorn, but the parties understood that Becker could not instantly take the job due to prior employment commitments. Id..  The parties agreed that Becker would arrive as soon as he could wrap up his commitments, and move to Kotzebue, Alaska, where the business is located. Id..

On about January 2, 2007, Becker arrived in Kotzebue, Alaska, to began his job as manager for KIC HAL. Id..  Prior to Becker's arrival, Bill Gallahorn promised him that when he began his position, he would have authority to hire and fire employees, and to direct the business operations with a free hand. Id..  Shortly after beginning as manager at KIC HAL, Becker discovered that he lacked the discretionary responsibilities that he expected to have as the manager. Aff.Plt., at 2.  Specifically, Becker learned that he had no control over administrative costs, and no independent discretion on inventory purchases. Id..  Further, Becker discovered that he had very little discretion concerning hiring and firing employees. Id..

On about January 15, 2007, Becker attended his initial KIC Board meeting. During this initial meeting Becker first learned that KIC implemented a "shareholder, and native" hiring preference. Id..  Mr. Becker also learned that the KIC board expected that preferential hiring of shareholders and Native Alaskan needed to be as high as possible. Id..  Shortly after the January 15, 2007 board meeting, Becker spoke with new KIC President Tim Schuerch concerning the shareholder/native hiring preference policies. Id..  Mr. Becker questioned Schuerch whether or not the shareholder/native hiring preference policy was unconstitutional.  Mr. Schuerch

became defensive concerning Becker's question, and stated that he believed the policy comported with federal laws. Id..

During the time that Becker worked for KIC, he followed its shareholder/native preference hiring policies to the best of his abilities. Id..  Mr. Becker carefully kept track of the racial categories of KIC HAL employees, in order to provide reports to KIC management. Id..  Although Becker followed the preferential hiring policy, he believed that he still had authority to hire non-shareholders/native employees. Id.. In fact, Becker did hire at least one Caucasian employee, when he could find no other shareholder applicant. Id..

Shortly after Becker hired a Caucasian employee, Sally Melton, KIC's human resource director, verbally questioned whether he was following the preferential hiring policy. Id..  Further, Melton exhibited anger at the fact that Becker hired a Caucasian employee. Id..  Additionally, Melton complained to KIC upper management, alleging that Becker did not want to follow the preferential hiring policy. Id..

As early as March 29, 2007, Becker sent an email to KIC President, Tim Schuerch, concerning his understanding that he had a one year contract for his job. Id.; Ex. A, 2.  Mr. Becker also mentioned to Schuerch that when he took the job he was told that he had three assistant managers at KIC HAL, to assist his job. Id.; Aff.Plt., at 2-3.  Mr. Becker informed Schuerch that he was working about 70 hours a week, mainly because shareholder employees would not show up to work on a consistent basis. Id..  In his March 29, 2007, email to Schuerch, Becker also told him that based on his attendance at the last board meeting, he felt it was clear that he would always be considered an outsider in the company. Id..

On April 22, 2007, Sally Melton sent Becker an email, identifying an application that she received for a position at KIC HAL. Aff.Plt., at 3; Ex. A, at 8.  Ms. Melton told Becker that the applicant was a shareholder, and that he should consider

1   him in future if KIC HAL had any openings. Id..  In response to this email, Becker

2   replied to Melton letting her know that he preferred to hire applicants that brought

3   applications to KIC HAL's offices, rather than being told to hire someone just because

4   they were a shareholder. Ex. A, at 7.  Mr. Becker did confirm to Melton that he had

5   been following the shareholder hire policy, and that KIC HAL operated at almost 90%

6   shareholder hire. Ex. A, at 8.

7          On May 21, 2007, Becker attended a KIC Board meeting to answer questions

8   about KIC HAL, and gather information on the company's concerns. Aff.Plt., at 3.

9   During this meeting, a new board member Harold Lambert questioned Becker

10  concerning why KIC HAL shareholder hire percentages were low. Id..  Mr. Becker

11  replied to Lambert that according to his understanding of the policy, he had been fully

12  complying with the policy. Id..  Mr. Becker told Lambert that he had only hired one

13  Caucasian employee, and that everyone else that had been hired complied with the

14  company preferential hire policy. Id..

15         During the May 21, 2007, KIC Board meeting Becker learned that some of the

16  shareholders he had classified as shareholders were not counted as such by KIC's

17  board because they were not Native Alaskans. Id..  Mr. Becker had suspected up until

18  this time that the shareholder preferential hire policy seemed to be merely a native-

19  only hire policy. Id..  After the May 21, 2007, KIC Board meeting Becker met with

20  Tim Schuerch and told him that the shareholder policy seemed more like a euphemism

21  for native-only hire policy. Aff.Plt., at 3-4.  Mr. Becker told Schuerch that he thought it

22  was wrong the way that KIC implemented its shareholder/native hiring policy. Id.., at

23  4.  Mr. Becker objected to Schuerch that the policy seemed discriminatory to non-

24  Native Alaskans. Id..

25         On June 21, 2007, Becker forwarded to Grant Hildreth the April 22, 2007

26  email that he sent to Sally Melton concerning shareholder hire. Id.; Ex. A, at 7.  Mr.

27

28   PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR
     SUMMARY JUDGMENT: *BECKER V. KIKIKTAGRUK INUPIAT CORPORATION*          PAGE - 4 -

1   Becker told Hildreth that he had gotten no assistance from Sally Melton concerning his

2   request for help with hiring, and shareholder hiring in particular. Id.. This email

3   followed discussions that Becker had with Hildreth concerning how shareholder were

4   being counted by Melton. Aff.Plt., at 4.

5          On June 22, 2007, Grant Hildreth replied to Becker's forwarded email, stating

6   that he appreciated his constructive input concerning hiring of employees. Id.. Mr.

7   Hildreth also stated that Melton was a good worker, and that her lack of response was

8   likely an oversight. Id.. Latter that day, June 22, 2007, Becker received a letter of

9   termination sent to him by Grant Hildreth. Ex. B, at 1.  Upon further inquiring into the

10  reason for his termination, Becker was told by Tim Schuerch that one of the reasons he

11  was fired was his disregard of the board's shareholder hire policy. Ex. A, at 10.

12         On June 26, 2007, four days after he was terminated, Becker had a personal

13  meeting with Tim Schuerch in Anchorage, Alaska, at the New Amsterdam café.

14  Aff.Plt., at 4.  During this meeting, Schuerch told Becker that the real reason Becker

15  was fired was because Schuerch was to be censured by the board of directors for

16  Becker's alleged non-compliance with the shareholder preference policy. Id.. Also,

17  during this meeting Schuerch made no reference validating the reasons listed in

18  Beckers termination letter.  Specifically, Schuerch made no mention that Becker had

19  poor financial oversight of KIC HAL, or that he was receiving viable complaints by

20  customers or employees. Id..

21         At the time of Becker's termination, he had accrued compensation for which he

22  had not been paid.  Specifically, Becker had accrued 53.87 hours of vacation pay, and

23  46.13 hours of sick leave. Ex. C, at 1; Ex. E, at 2.  It is Becker's understanding of KIC

24  policy that these hours were compensable at the time of termination. Ex. C, at 2-3.

25  However, Becker has never received his vacation pay, or his accrued sick leave. Ex. E,

26  at 2.

27

28

1    During the time that Becker worked as manager of KIC HAL, he consistently

2    had to devote a major portion of his work time performing menial, non-managerial

3    duties because shareholder's working at KIC HAL would seldom arrive to work on

4    time. Ex. A, at 2-3.  Additionally, Becker made attempts to freely discipline employees

5    when he believed necessary, due to disrespect at the workplace, or poor attendance.

6    Aff.Plt., at 5.  However, Becker was consistently told by Sally Melton that he could not

7    undertake these discretionary duties. Ex. A, at 5-6.  Further, Becker did not have

8    discretion to hire for positions that he needed filled at KIC HAL. Id..  As a result,

9    Becker was required to work far in excess of 40 per week. Id..; Ex. A, 2-3.

10   At the time that KIC terminated Becker's employment, he was doing an

11   excellent job as manager, despite the persistent constrains on his ability to do his job.

12   Mr. Becker never received any complaint that KIC HAL was losing money, and his

13   reports showed that the business was exceeding prior sales numbers. Id..  The only

14   employee complaints that Becker knew about concerning his job performance dealt

15   with him objecting to poor work by shareholder employees. Ex. B, at 2-5.  Further,

16   Becker was traveling to Anchorage on business purposes, because KIC needed help

17   closing a cabinet outlet store that it had been operating. Aff.Plt., at 5.

18   **II.    STANDARD OF REVIEW**

19   The United States Supreme Court observed that "at the summary judgment

20   stage the judge's function is not himself to weigh the evidence and determine the truth

21   of the matter but to determine whether there is a genuine issue for trial." Anderson v.

22   Libby Lobby, Inc., 477 U.S. 242, 249 (1986).  Continuing, the Court stated that the

23   "inquiry performed is the threshold inquiry of determining whether there is the need

24   for a trial – whether, in other words, there are any genuine issues that properly can be

25   resolved only by a finder of fact because they may reasonably be resolved in favor of

26   either party." Id., at 250.

27

28

1       The Ninth Circuit Court of Appeals has noted that "[d]espite the Supreme

2  Court's clear pronouncement limiting the scope of summary judgment, other circuits

3  have carved out various exceptions under which a court may disregard self-serving and

4  incredible testimony or affidavits." <u>Leslie v. Grupo ICA</u>, 198 F.3d 1152, 1157 (9th Cir.

5  1999).  To clarify, and distinguish, the Ninth Circuit's treatment of summary judgment

6  the <u>Leslie</u> court wrote: "if direct evidence produced by the moving party conflicts with

7  direct evidence produced by the nonmoving party, the judge must assume the truth of

8  the evidence set forth by the nonmoving party with respect to that fact." <u>Id.</u>, at 1158

9  (citations omitted).  The Ninth Circuit continued, holding that "[w]e specifically reject

10  the notion that a court could disregard direct evidence on the ground that no reasonable

11  jury would believe it." See <u>Id.</u>, at 1158.

12       The Supreme Court has also clearly delineated what a plaintiff facing summary

13  judgment must do in order to survive Rule 56 dismissal.  The Court stated that "the

14  plaintiff, to survive the defendant's motion, need only present evidence from which a

15  jury might return a verdict in his favor.  If he does so, there is a genuine issue of fact

16  that requires a trial." <u>Anderson v. Libby Lobby</u>, 477 U.S., at 257.  Similarly, the Ninth

17  Circuit states, "[w]e require very little evidence to survive summary judgment in a

18  discrimination case, because the ultimate question is one that can only be resolved

19  through a 'searching inquiry' – one that is most appropriately conducted by the

20  factfinder, upon a full record." <u>Metoyer v. Chassman</u>, 504 F.3d 919, 930, (9th Cir.

21  2007), citing: <u>Lam v. University of Hawaii</u>, 40 F.3d 1551, 1564 (9th Cir. 1994).

**III.**    <span style="font-variant: small-caps"><u>**ARGUMENT**</u></span>

23       In its request that this court dismiss Becker's claims against it, KIC relies

24  almost exclusively on contested facts, or statements taken out of context.

25  Additionally, KIC has relied on the incorrect legal standards in presenting most of its

26  arguments.  On all points this court should deny KIC request for summary judgment.

A.   GENUINE ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON BECKER'S CLAIMS UNDER ALASKA'S WAGE AND HOUR ACT.

In its argument that Becker's Wage and Hour claim must fail, KIC spends two pages explaining the variable facts that go into determining whether an employee is exempt under Alaska's Wage and Hour Act. Dkt. 37, at 5-6.  The lengthy analysis that is required illustrates the fact intensive nature of analyzing whether an employee is an exempt executive under the wage act.  On almost every material point, KIC has failed to show that the absence of genuine fact dispute on Becker wage claim.

As an initial matter, Becker's wage claim encompasses a claim for unpaid compensation.  It is an undisputed fact that at the time that KIC fired Becker he had accrued vacation and sick leave compensation. Ex. C, at 1; Ex. E, at 2.  After terminating his employment, KIC failed to pay Becker for these items of compensation. Id..  Concerning his unpaid vacation time, KIC argued that it did not pay Becker because it had questions concerning the hours that he worked. Ex. E, at 2.

This fact dispute alone precludes summary judgment on Becker's wage claim. It also raises questions concerning whether Becker was compensated on a salary basis. If Becker was compensated on a salary basis, then his hours would not be in question, and the vacation time should have been paid.  If a question concerning his hours worked, and correspondingly his compensation owed, then it is clear that a variation in his payment exists, and he is not a salaried employee.  If Becker is not a salaried employee, he is not an exempt employee. 29 C.F.R. § 541.100(a).

Aside from the clear fact that Becker is owed vacation and sick leave compensation, it is equally clear that fact dispute exists concerning whether management was his primary duty.  In his email to Tim Schuerch, on March 29, 2007, Becker explains that he is working in excess of 140 hours a pay period because his employees refused to show up on time. Ex. A, at 2-3.  This email confirms Becker's allegation that he did not have the discretion to discipline his employees, or hire

adequate staff to run the business without him having to work so many hours.
Obviously, if Becker had an option to hire more employees, or fire unproductive
employees, he would have done so, thereby minimizing the hours that he had to work.

The March 29, 2007, email additionally raises fact disputes concerning whether
Becker had actual authority to hire, fire, or otherwise change the status of his
employees.  It is true that Becker made some of these decisions, based on his belief
that he had this authority.  However, Becker's authority to make these decisions was
continually called into question.  Sally Melton, and KIC board members, told Becker
that he could only hire shareholders. Ex. A, at 8.  Further, when Becker did discipline
employees, he actually had the employee's parent contact KIC President, Tim
Schuerch, to complain. Ex. A, 5-6.  Further, Mr. Schuerch actually took notice of the
employee's mother's complaints. Ex. A, at 5.

Finally, Becker's termination raises factual disputes concerning whether he had
the requisite discretion to classify him as an exempt employee.  Among the stated
reasons for his termination, KIC alleged that Becker failed to follow shareholder hiring
policy, overly disciplined employees, and took trips on behalf of the company. Ex. A,
at 9-11; Ex. B, at 1. These allegations for why KIC terminated Becker's employment,
cast a factual dispute over whether he ever had authority to decide how the business
should be operated.  The employee complaints indicate that Becker had no authority to
fire employees, or otherwise manage the conduct of the shareholders working at KIC
HAL. Ex. B, at 2-5.

The issue of whether an employee is exempt under the Alaska Wage and Hour
Act is very fact intensive.  KIC has failed to establish the absence of fact dispute, and
therefore its request for summary judgment on the issue should be denied.  Fact
disputes exist concerning whether Becker is entitled to unpaid vacation and sick leave
pay.  These fact disputes preclude summary judgment on Becker's wage claims.

B.    KIC'S STATUS AS AN ALASKA NATIVE CORPORATION DOES NOT PREVENT BECKER FROM FILING AN EMPLOYEE CLAIM UNDER 42 U.S.C. § 1981.

In its motion for summary judgment, KIC advances several arguments claiming that this court should dismiss Becker's claims under 42 U.S.C. § 1981.  KIC has broken its argument into three independent sections, each dealing with different aspects of Becker's § 1981 claim.  To maintain consistency, Becker will address these three arguments separately, although, in reality many of these issues are interrelated.

Under its initial theory, KIC argues that Becker's 42 U.S.C. § 1981 claim fails because as a Alaska Native Corporation it is exempt from such claims. Dkt. 37, at 12. To support its argument, KIC theorizes that the Civil Rights Act of 1866 has been merged into the Civil Rights Act of 1964 [Title VII]. Id..  KIC points out that under the terms of the Alaska Native Claims Settlement Act, 43 U.S.C. § 1601 et seq., Congress intended to exempt Native corporations from employment discrimination suits. Id..

As authority for its theory, KIC cites to a section within the Alaska Native Claims Settlement Act.  KIC points out that under a section entitled, Relation to Other Programs, Congress legislated that "[f]or the purposes of implementation of the Civil Rights Act of 1964 [42 U.S.C. § 2000a et seq.], a Native Corporation . . . shall be within the class of entities excluded from the definition of 'employer.'" 43 U.S.C. § 1626(g). Dkt. 37, at 12, n. 70.  Although, the referenced citation only applies to Title VII, KIC argues that "the Civil Rights Act of 1964, designed to expressly address employment discrimination, must control over the broad rights provisions of statutes like 42 U.S.C. § 1981." Id., at 13, Citing: Wardle v. The Ute Indian Tribe, 623 F.2d 670, 673 (10th Cir. 1980).  Additionally, 42 U.S.C. § 2000e(b), specifically exempts corporations owed by Indian tribes from the definition of 'employer,' for purposes the Civil Rights of 1964.

The most glaring flaw in KIC's argument is that it contradicts a recent ruling by the Fourth Circuit Court of Appeals.  In Aleman v. Chugach Support Services, Inc.,

485 F.3d 206 (4th Cir. 2007), the Fourth Circuit address the issue of whether 43 U.S.C. § 1626(g), and 42 U.S.C. § 2000e(b), control claims filed under 42 U.S.C. § 1981.

In Aleman, multiple plaintiffs brought suit against Chugach Alaska Corporation, which like KIC is an Alaska Native Corporation.  One of the plaintiff's, James Blasic, a Caucasian employee, alleged that Chugach "violated the anti-discrimination statutes by terminating him in retaliation for reporting racial discrimination in the company's operations." Aleman, 485 F.3d, at 210.  Blasic filed his claim against Chugach under both federal civil rights statutes, Title VII, and 42 U.S.C. § 1981.  Chugach argued that the court should dismiss Blasic's claims on the exemption identified at 43 U.S.C. § 1626(g), and 42 U.S.C. § 2000e(b). Id..

In its decision, the Fourth Circuit concluded that Blasic's retaliation claim under Title VII is barred, but his claim under 42 U.S.C. § 1981 is unaffected by the exemption identified in the Native Claims Settlement Act, and Title VII. Aleman, 485 F.3d, at 211.  The court identified two reasons for permitting the § 1981 claim against the Native corporation. Id..  The court held the following: 1) "[b]y their own terms, the Title VII exclusions are limited to Title VII itself," and 2) "Section 1981 – which the Supreme Court instructed us to treat as a separate and distinct cause of action – contains no exemption corresponding to those in Title VII." Id..  Continuing, the court stated, "[w]hile the definition of 'employer' in Title VII excludes Indian tribes and Alaska Native Corporations, these exclusions state that they are limited to the section of federal law that contains Title VII." Id..

The court observed that in contrast to Title VII, "Section 1981 contains no similar exception for Alaska Native Corporations." Id..  While Title VII derives from the Civil Rights Act of 1964, Section 1981 was enacted as part of the Civil Rights Act of 1866. Id..  "The Supreme Court has long held the Civil Rights Act of 1866 'to prohibit all racial discrimination, whether or not under color of law, with respect to the

1 rights enumerated therein." <u>Id.</u>.  Even though Congress amended the statute in 1991,

2 'Section 1981 makes no mention of Alaska's Native Corporations or Indian tribes, and

3 it includes no terms that could be constructed to set such entities outside the statute's

4 reach." <u>Id.</u>.

5   In stark contrast with KIC's argument, the Fourth Circuit pointed out that Title

6 VII is intentionally more narrow than § 1981, rather than the other way around.  The

7 Fourth Circuit observed that in <u>Johnson v. Railway Express Agency, Inc.</u>, the Supreme

8 Court held that "'Section 1981 is not coextensive in its coverage with Title VII,' in

9 part because 'the latter is made inapplicable to certain employers.'" <u>Aleman</u>, 485 F.3d,

10 at 212, citing: <u>Railway Express</u>, 421 U.S. 454, 460 (1975).  The Fourth Circuit argued

11 that "[t]he Supreme Court has foreclosed such a reading of Title VII as intended to

12 amend Section 1981 *sub silentio* in the area where Title VII is more specific, holding

13 'that the remedies available under Title VII and under § 1981, although related, and

14 although directed to most of the same ends, are separate, distinct, and independent."

15 <u>Aleman</u>, 485 F.3d, at 212, citing <u>Railway Express</u>, 421 U.S., at 461.

16   It must be noted that KIC's reliance on <u>Wardle v. The Ute Indian Tribe</u>, is

17 inapposite to the facts alleged by Becker's suit.  Unlike, <u>Aleman</u>, which dealt

18 specifically with potentially valid claims filed under Title VII *and* § 1981, <u>Wardle</u>,

19 really only addressed liability under Title VII. <u>Wardle</u>, 623 F.2d, at 672.  In assessing

20 plaintiff Blasic's claims, the Fourth Circuit had an opportunity to apply § 1981, as

21 amended by the Civil Rights Act of 1991. <u>Aleman</u>, 485 F.3d, at 211.  Prior to the Civil

22 Rights Act of 1991, 42 U.S.C. § 1981 prohibited race discrimination only when

23 occurring during the formation of the employment contract. <u>CBOCS West, Inc. v.</u>

24 <u>Humphries</u>, 128 S.Ct. 1951, 1956 (2008).  As such, employees with a post-contract

25 claim needed to rely on Title VII.  The Civil Rights Act of 1991 expanded § 1981

26 claims to include post-contract discrimination, including hostile-work environment,

27

28

1    unlawful termination, and retaliation claims. Id., 128 S.Ct., at 1960.

2        When the Tenth Circuit decided, Wardle v. The Ute Indian Tribes, it restricted

3    its analysis solely to the plaintiff claims under Title VII. Wardle, 623 F.2d, at 672.  The

4    plaintiff in Wardle, a police chief on tribal lands, did file his claim under a litany of

5    federal statutes, including 42 U.S.C. § 1981.  However, when the Tenth Circuit

6    analyzed Mr. Wardle's claim it focused on the fact that only Title VII specifically

7    declares it unlawful for an employer to *discharge* an employee because of race. Id.,

8    623 F.3d, at 673.  It is apparent that the Tenth Circuit's focus centered on the fact that

9    § 1981 prohibited race discrimination *generally*, i.e. it did not specify that it prohibited

10   race-based discriminatory *discharge*. Id..  Pursuant to the Civil Rights Act of 1991,

11   however, § 1981, now specifically prohibits discriminatory discharge, hostile

12   environment and retaliation.

13       Aleman represents case law that is more comparable to the facts within

14   Becker's case.  Additionally, only Aleman deals specifically with Alaska Native

15   corporations, which are legal entities that differ from a traditional Indian Tribe, with a

16   history of retained sovereign authority. Native Village of Stevens v. Alaska

17   Management & Planning, 757 P.2d 32, 34 (Alaska 1988); Seldovia Native Association

18   v. Lujan, 904 F.2d 1335, 1350 (9th Cir. 1990).  In contrast, Wardle dealt with an

19   employment discrimination claim occurring on or around an Indian reservation.  KIC

20   is not a tribal unit that has ever established governmental authority under a reservation

21   system. Native Village of Stevens, 757 P.2d, at 34.

22       Based on the above analysis, Becker argues that this court should reject the

23   legal argument KIC presented to this court.  Becker requests that this court issue a

24   ruling that neither 43 U.S.C. § 1626(g), nor 42 U.S.C. § 2000e(b), prohibit his 42

25   U.S.C. § 1981 claim against KIC.  Under 42 U.S.C. § 1981, KIC is an employer

26   subject to the protection afforded by the Civil Rights Act of 1866, as modified by the

27

28

1   Civil Rights Act of 1991.

2   C.   BECKER DOES NOT ALLEGE A CLAIM FOR DISPARATE TREATMENT UNDER 42
         U.S.C. § 1981, RATHER HE ALLEGES KIC RETALIATED AGAINST HIM FOR
3        ALLEGING THAT KIC'S SHAREHOLDER PREFERENCE WAS ILLEGAL.

4        Under its second theory, KIC argues that Becker cannot assert a disparate

5   treatment claim under 42 U.S.C. § 1981, because "he is unable to satisfy the elements

6   of a prima facie case for discrimination." Dkt. 37, at 14.  KIC argued that Becker failed

7   to "identify a single similarly situated employee," not in his protected class that was

8   treated more favorably. Id..

9        Becker argues that although he can establish disparate treatment that occurred

10  while he worked at KIC, his 42 U.S.C. § 1981 claim is based on allegation of

11  retaliation. Dkt. 1-2, at 7.  Becker's complaint alleges facts that establish disparate

12  treatment on the basis of race, however, he asserts that KIC fired him in retaliation for

13  his statements in opposition to KIC's native preference hiring policy. Id..  Becker does

14  not allege that the disparate treatment that he noticed, wherein his supervisors showed

15  Native American preference in job performance, resulted in any adverse employment

16  action. Id..  Becker listed the instances of disparate treatment referenced in his

17  complaint in order to establish a clear link to the racial element of his retaliation claim.

18       It is Becker's allegation that he suffered adverse employment action, i.e. lost

19  his job, in retaliation for his act of questioning the legality of KIC's shareholder

20  preference in employment. Id..  Retaliation, however, is a form of discrimination, and

21  is actionable under 42 U.S.C. § 1981.  CBOCS West, 128 S.Ct.,at 1956.

22  D.   KIC'S SHAREHOLDER HIRING PREFERENCE AS IMPLEMENTED IS ILLEGAL, AND
         BECKER HAS DIRECT EVIDENCE SUPPORTING HIS CLAIM FOR RETALIATION
23       UNDER 42 U.S.C. § 1981.

24       Under its third theory, KIC argues that "Becker cannot prevail on his retaliation

25  theory because KIC's shareholder hiring preference policy is legally based on a

26  political designation." Dkt. 37, at 17.  KIC correctly states that "[t]o establish a prima

27

28

facie case of retaliation under 42 U.S.C. § 1981, Becker must prove that he was: 1) engaged in a protected activity; 2) that KIC subjected the employee to an adverse employment action; and 3) that there is a causal link between the activity and the adverse action." Id.., citing: Manatt v. Bank of America, NA, 339 F.3d 792, 800 (9th Cir. 2003).  KIC alleges that Becker's retaliation claim fails because he "cannot demonstrate that he was engaged in a protected activity nor can he demonstrate a causal link between the adverse employment action and the protected activity." Dkt. 37, at 17-18.

Becker argues that he can establish through direct and circumstantial evidence that he engaged in protected activity, and that a clear and direct causal link exists that illustrates that KIC retaliated against him.  Chassman, 504 F.3d, at 930.

1.    BECKER ENGAGED IN PROTECTED ACTIVITY WHEN HE QUESTIONED HOW KIC IMPLEMENTED ITS SHAREHOLDER HIRING PREFERENCE.

KIC correctly states that "[e]ngaging in a protected activity includes protesting or otherwise opposing unlawful employment discrimination." Dkt. 37, at 18, citing: Moyo v. Gomez, 40 F.3d 982, 984 (9th Cir. 1994).  However, KIC alleges that "Becker cannot establish that KIC's shareholder hiring amounted to unlawful employment discrimination," because it claims the preference is "based on political designations and not on race." Dkt. 37, at 18.  To support it argument, KIC references as authority a district court decision that deals with a factual scenario far different from Becker's case. Id., referencing: Contiz v. Teck Cominco Alaska, case no. 4:09-cv-0020-RRB.

KIC's argument fails for numerous reasons, not least of which is the fact that it misstates the legal premise behind Becker's retaliation claim.  KIC alleges that Becker's retaliation suit is premised on the claim that he "refused to implement KIC's shareholder hiring preference." Dkt. 37, at 18.  However, Becker's allegation is actually that KIC retaliated against him because he *questioned* to KIC President Tim Schuerck, and Grant Hildreth, concerning the legality of shareholder preference.

Aff.Plt., at 4.

Becker originally did not object to KIC's shareholder policy, as it was initially explained to him when he took his job. Ex. A, at 4, 7-8.  Without really making a judgment call on the legality of KIC's shareholder preference policy, Becker tried to implement the policy wherever he suggested hiring decisions. Id..  Further, when Becker collected census data concerning shareholder employment at KIC HAL, he complied with the policy as it had been explained to him. Aff.Plt., at 3.

During the May 21, 2007, KIC Board meeting Becker encountered problems with board members, specifically Harold Lambert, concerning his compliance with the hiring policy. Id..  Significantly, Becker discovered that some of the employees that he had listed as shareholders, had been categorized differently by Sally Melton. Id..  When questioned, Becker discovered that Melton had reclassified some of KIC HAL's employees because these employees were not Native Alaskan, but rather only spouses of shareholders. Id..

This altering in how KIC classified shareholders concerned Becker, and this is the subject that he brought to the attention of Schuerch and Hilderth. Aff.Plt., at 3-4.  During the conversation with Schuerch, Becker specifically stated that he believed that the shareholder hiring policy actually resembled a Native-Alaskan-only hiring preference. Id..  Becker specifically objected to the discriminatory implications behind how KIC implemented its stated shareholder preference policy. Id..  Further, Becker pressed the issue of shareholder hire policies with Hilderth concerning Sally Melton.  Ex. A, at 7-8.  Email correspondence establish that Becker and Hilderth had been discussing shareholder hiring issues on the day that he was fired. Id..  Significantly, in the days before he was terminated no email correspondence exists pertaining to any bad performance by Becker concerning operating KIC HAL, or how he interacted with staff or customers.  The only issue within email correspondence before his termination

1   related to shareholder hiring preference. Id..

2        In its motion for summary judgment, KIC misidentifies the protected activity

3   upon which Becker's retaliation claim is premised.  This fatal flaw demolishes the

4   legal arguments that KIC makes concerning Becker's retaliation claim.  In its motion,

5   KIC claims Becker alleges that he lost his job because he resisted the company's

6   shareholder hiring preference. Dkt. 37, at 19.  A factual dispute apparently exists over

7   this issue, since Becker actually alleges that KIC fired him in retaliation to statements

8   by him that the shareholder policy, as implemented, amounted to racial discrimination.

9   Aff.Plt., at 3-4.

10        Becker alleges KIC terminated him because he questioned the legality of its

11  hiring preference, not because he refused to comply with the policy. Id..  As such, the

12  actual legality of KIC's shareholder policy is immaterial to Becker's retaliation claim.

13  The only actual complaint that Becker received from KIC board members, and Sally

14  Melton, concerned the fact that he hired a single Caucasian employee. Id.. No evidence

15  exists to suggest that Becker refused to comply with KIC's policies.  However, ample

16  evidence exists to show that his termination occurred in close proximity to his

17  allegations that the hiring preference discriminated against non-Alaskan employees.

18  Id., Ex. A, at 7-11.

19        Becker's retaliation claim is factually similar to Aleman v. Chugach Support

20  Services, Inc., in that both cases concern retaliation over allegations of discrimination.

21  In Aleman, one of the plaintiffs, James Blasic, a Caucasian employee of a Native

22  Alaska Corporation, asserted a retaliation claim under 42 U.S.C. § 1981 because his

23  company fired him shortly after he reported what he perceived to be discriminatory

24  conduct in the workplace.  485 F.3d, at 210.  The Aleman court did not conduct a legal

25  analysis into whether Blasic correctly identified discriminatory conduct in the

26  workplace.  Rather, the issue centered around whether or not his complaint concerning

27

28

1    allegations of discrimination, taken by themselves, became the basis for his

2    termination. Id., 485 F.3d, at 213-214.

3         KIC's linkage between the legality of its shareholder preference and its

4    decision to terminate Becker's questioning of the policy, has no legal significance.  On

5    the issue of KIC's hiring policy, however, it is clear that the policy on its face, and in

6    its application, is race-based and discriminatory.  KIC reliance on Conitz v. Teck

7    Alaska, Inc., is utterly without merit.  This case is factually dissimilar to Becker's case,

8    and the claims alleged sounded in disparate treatment and impact, rather than

9    retaliation.  Further, the case referenced by KIC, went to the Ninth Circuit on appeal,

10   where the court issued no ruling concerning the validity of shareholder preference

11   claims. See: 331 Fed.Appx. 512, 513 (9th Cir. 2009).  In Conitz, the plaintiff failed to

12   establish a prima facie case of disparate treatment, provided no direct evidence to

13   validate his claim, and failed to support his disparate impact case with admissible

14   statistics. Id..

15        In contrast to KIC's inapposite case authority, Becker points the court to

16   Malabed v. North Slope Borough, 70 P.3d 416 (Alaska 2003); 335 F.3d 864 (9th Cir.

17   2003), as authority against KIC's shareholder preference policy.  In Malabed, the Ninth

18   Circuit faced the question concerning the constitutionality of the North Slope

19   Borough's Native American ordinance.  The Ninth Circuit presented the issue to the

20   Alaska Supreme Court, which held that the statute violated Alaska's Human Rights

21   Act.  The Alaska Supreme Court held, after lengthy analysis, that the ordinance "could

22   be construed as a proxy for an illegitimate race-conscious purpose." Malabed, 70 P.3d,

23   at 424.  However, the Court concluded that even if the classification were broadly

24   construed as a political classification, rather than racial, it still violated the Alaska

25   Constitution. Id., at 428.

26        Consequently, KIC's shareholder policy is illegal, all that is at issue is whether

27

28

its illegality is premised on racial discrimination or national origin discrimination. Becker argues that KIC's shareholder policy is clearly racially discriminatory on its face, because it is too broadly written.  Unlike the shareholder preference policy in Conitz, which favor only Nana shareholders, KIC's policy favors its shareholders, Nana shareholders, all other Native corporation shareholders. Ex. A, at 1; Ex. D, at 2-3.  KIC's handbook also states that "Native preference is given in all hiring actions." Ex. D, at 2.  Further, statistics kept by KIC concerning its hiring policy specifically differentiates between "Alaska Native Hire," and "Other Race," hires. Ex. D, at 1, 4.

As such, KIC's shareholder hiring policy is definitely a proxy for race-based discrimination against non-Native Alaskan hires.  However, Becker's claim of retaliation does not succeed or fail on whether the policy is discriminatory.  As stated previously, Becker's protected activity occurred when he questioned to his supervisors at KIC, Tim Schuerch and Grant Hildreth, that he thought the policy, as implemented, was discriminatory.  Becker merely questioned the policy's legality, and KIC terminated his employment as a result.  This is the premise of Becker's retaliation claim.  Becker does not rest his claim on the legality of KIC's shareholder policy because this is not a required element of his retaliation claim.

In contrast to KIC's argument to the contrary, Becker has provided evidence to support the allegation that he engaged in a protected activity when he questioned the legality of KIC's shareholder hiring policy.

2.   BECKER CAN ESTABLISH A CLEAR CAUSAL LINK BETWEEN HIS PROTECTED ACTIVITY AND HIS TERMINATION BY KIC.

Finally, concerning Becker's retaliation claim, KIC argues that he is unable to draw a causal link between protected activity and his termination. Dkt. 37, at 20.  KIC argues that the link is "fanciful at best," based on its attempt to connect Becker's January 15, 2007 comments to his termination on June 22, 2007. Id..  However, Becker has provided direct and circumstantial evidence that he did not have an issue with

1   KIC's policy in January 2007. Ex. A, at 4, 7-8.  All he did was ask about the policy in

2   January 2007. Aff.Plt., at 2.  Becker has produced evidence showing that he complied

3   with the shareholder policy, even after the January 2007 meeting. Ex. A, at 4, 7-8; Ex.

4   D, at 4.

5         In a retaliation claim alleging direct evidence of retaliatory animus, Becker

6   does not even need to establish a causal link.  The causal link exists by virtue of KIC

7   stating that it terminated his employment based on his failure to follow shareholder

8   hire policy. <u>Chassman</u>, 504 F.3d, at 931.  This stated reason is negated by the fact that

9   Becker did in fact comply with the policy.  The lack of credence in KIC's stated reason

10  for its decision to terminate Becker, is circumstantial evidence that it actually fired him

11  because he questioned the policy.  Nonetheless, Becker does establish a causal link by

12  showing that he questioned the shareholder policy after the May 21, 2007 board

13  meeting, and  questioned it in emails to Hildreth on June 22, 2007, the date of his

14  termination. Ex. A, at 7; Ex. B, at 1.

15        Mr. Becker has provided significant direct and circumstantial evidence to raise

16  a triable issue of fact concerning whether KIC terminated his employment in

17  retaliation for his questioning the legality of how it implemented its shareholder hiring

18  preference.  Given the direct and circumstantial evidence provided, this court should

19  deny KIC's request for summary judgment as to his 42 U.S.C. § 1981 retaliation claim.

20  E.    <u>KIC Fired Becker Because He Objected to Its Illegal Hiring Practices,
        Thereby Supporting His Claim of Wrongful Termination.</u>

21        KIC argues that Becker has not pled a triable claim of wrongful termination.  In

22  support of its argument, KIC theorizes that Becker's claim is that he refused to

23  implement the hiring preference. Dkt. 37, at 21.  As has already been pointed out,

24  Becker alleges that he suffered retaliation because he questioned the policy's legality,

25  not because he failed to implement the policy.  It has been established that Becker only

26  hired one employee that did not fall into the protected classification.

27

28

1    Becker's has provided direct and circumstantial evidence that KIC fired him

2    because he questioned the legality of KIC's hiring policy.  As a side note, Becker has

3    argued that the policy is in fact illegal.  However, Becker's claim of wrongful

4    termination is premised on the fact that he complained about a preferential hiring

5    policy, and this protected activity led to him being fired.

6    Becker has established that, at the very least, a triable issue of fact exists

7    concerning whether KIC terminated his employment because he used his free speech to

8    question the legality of his employer's hiring policies.  As such, this court should reject

9    KIC's request for summary judgment on this issue.

10   F.    Becker Has Made Efforts To Mitigate His Damages.

11   As a final effort to dismiss Becker's valid claims, KIC argues that he failed to

12   mitigate his damages. Dkt. 37, at 21.  The factual allegations that KIC uses to base its

13   argument upon, are simply untrue.  In response to discovery requests, Becker stated

14   clearly that he has not sought employment in retail because he did not want the issue of

15   his termination to be addressed.  However, Becker stated that he had gainful

16   employment shortly after being terminated.  He stated that he has not had steady

17   employment since being fired, but this does not provide KIC with an opportunity to

18   utterly dismiss his claims.

19   Furthermore, Becker's allegations against KIC request payment for emotional

20   distress, unpaid wages, and consequential damages for which mitigation is not an

21   issue.  Part of Becker's employment contract provided that he would enjoy housing as

22   part of his compensation package.  By terminating his employment, Becker incurred

23   consequential damages associated with having to pay for housing costs.  These costs

24   exist, and are not extinguished based on the theory that he did not seek every

25   employment opportunity available to him.

26   The issue of damages, particularly emotional distress, are fact issues that must

27

28

1   be decided by a jury.  KIC has presented no evidence to suggest that Becker has made

2   no effort to mitigate his damages.  Further, KIC can make its case at trial concerning

3   how drastically the jury should reduce Becker's damage award based on its argument

4   that he did not properly mitigate damages.  However, KIC has provided not legal

5   theory that holds an employer's illegal conduct can be excused if the employee did not

6   actively seek every employment opportunity.

7        For these reasons, above identified, KIC's request for dismissal based on its

8   allegation that Becker failed to mitigate his damages must be denied.

9                                        CONCLUSION

10       As the party seeking summary judgment, KIC bears the initial burden of

11  proving that no genuine issue of facts exists, and then proving that it is entitled to

12  judgment as a matter of law on the undisputed facts.  KIC has totally failed to achieve

13  its burden of proving that Becker has no triable claim to present to the trier of fact.  At

14  the summary judgment stage, the court must resolve any fact dispute in favor of the

15  nonmoving party.  As such, KIC's arguments in favor of summary judgment fall flat.

16       The facts, and the law, establish that KIC is not entitled to summary judgment

17  in this case.  Becker requests that this court deny KIC's motion on all grounds.

18

19       DATED this __24th__  Day of February 2010.

20                                        S/ Isaac Zorea
                                          Law Offices of Isaac D Zorea
21                                        P.O. Box 210434
                                          Anchorage, AK 99521
22                                        907-830-1385
                                          907-677-3779
23                                        Eyedz@gci.net

24

25

26

27

28  PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR
    SUMMARY JUDGMENT: *BECKER v. KIKIKTAGRUK INUPIAT CORPORATION*          PAGE  - 22 -

1

<u>Certificate of Service</u>

2

I hereby certify that on February 24, 2010
3   I electronically filed the foregoing with
the Clerk of Court using the CM/ECF
4   system which sent notification to the
following:

5

M. Scott Broadwell
6

and I hereby certify that I have mailed by
7   United States Postal Service the document
to the following non CM/ECF participants:

8

none.
9

Dated this 24th day of February 2010, at
10   Anchorage, Alaska.

11    S/ Isaac Zorea
Law Offices of Isaac D Zorea
12    P.O. Box 210434
Anchorage, AK 99521
13   907-830-1385
907-677-3779
14   Eyedz@gci.net

15

16

17

18

19

20

21

22

23

24

25

26

27